**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | Case No. 08-11525 (BLS) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| SAMSON RESOURCES COMPANY, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Adversary No. 08-51445 |
| | ) | (OKLAHOMA) |
| | ) | |
| SEMCRUDE, L.P., <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>OPINION</u>**[1]

Before the Court are a number of related summary judgment motions. These include Plaintiffs' Motion for Summary Judgment on Phase I Issues [Docket No. 166], filed by certain Oklahoma producers of oil and gas (the "Oklahoma Producers"); Bank of America, N.A.'s Motion for Summary Judgment on the Threshold Questions of Law [Docket No. 161], filed by Bank of America, N.A., as administrative agent for the debtors' pre-petition lenders (the "Banks"); J. Aron & Company's Consolidated Motion for Summary Judgment [Docket No. 152], filed by J. Aron & Company ("J. Aron"),

---

[1]    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

an intervening party; and the joinders thereto as reflected on the docket in this adversary proceeding.

For the following reasons, the Court will grant in part the Motion of the Banks and deny the Motion of the Oklahoma Producers.

## I.   **PRELIMINARY STATEMENT**

The competing motions for summary judgment presently before the Court raise a question of first impression:  whether prior perfected article 9 security interests asserted by the Banks are superior to the rights and interests accorded to Oklahoma Producers under Oklahoma's Production Revenue Standards Act, Okla. Stat. tit. 52, § 570.1 et seq. (the "PRSA").[2]

As explained in detail below, the Court concludes as a matter of law that the PRSA does not impose a resulting, implied or constructive trust in favor of the Oklahoma Producers.  The plain language of the Oklahoma statute, fairly construed, is simply insufficient to support the contention that the remedy and protection of a trust was imposed or intended.  Accordingly, summary judgment will be entered in favor of the Banks, in that duly and properly perfected article 9 security interests in the

---

[2]     The Court is not now deciding the factual issues specific to the claims of individual Oklahoma Producers and the Banks, such as whether and to what extent they can prove up their particular claims and whether the Banks have satisfied the requirements for perfection and priority of their asserted liens, respectively.  Pursuant to the Producer Claims Procedures Orders (defined and described infra), those issues are left for the next phase of this litigation.

Oklahoma oil and gas production and proceeds therefrom are senior and superior to any interest held by the Oklahoma Producers.

The Court recognizes that it is ruling today on novel issues of great significance to the parties, both in economic terms and as a business reality in the oil and gas industry.  There is little doubt that this ruling will be appealed.  In light of these considerations, the Court will certify this Opinion and Order for direct appeal to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii).

## II. **BACKGROUND**

A. General Background

On July 22, 2008 (the "Petition Date"), SemGroup, L.P. ("SemGroup"), and certain direct and indirect subsidiaries (collectively referred to hereinafter as the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Code").  The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Code.

On August 5, 2008, the Office of the United States Trustee

-3-

(the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors Committee").  By Order dated October 15, 2008, the Court directed the U.S. Trustee to appoint and constitute a committee to represent the interests of producers of oil and gas who had sold product to the Debtors (the "Producers Committee")[Case No. 08-11525, Docket No. 1774].  Both the Creditors Committee and the Producers Committee have retained professionals and have actively participated in these cases.[3]

Founded in February 2000, the Debtors engage in a number of different businesses, each related to the energy industry. Included among the Debtors are several corporations which engage in the business of purchasing various forms of energy products, such as crude oil and natural gas, from producers and then subsequently reselling these products to refiners and other resellers in various types of sale and exchange transactions. The consolidated revenues of the Debtors during fiscal year 2007 were approximately $13.2 billion.

Historically, as part of their overall business strategy, the Debtors sought to establish a margin on their anticipated purchases of energy products by selling energy products for physical delivery to customers or by entering into future delivery obligations under futures contracts on the New York

---

[3]     The Court notes that the Producers Committee is, by design, not a party to this litigation.

-4-

Mercantile Exchange ("NYMEX") and over-the-counter ("OTC")
markets.  In the weeks leading up to the Petition Date, volatile
energy  prices increased the Debtors' margin requirements,
causing a negative impact on the Debtors' liquidity positions.
These cash flow problems were further exacerbated by catastrophic
trading losses.  On July 16, 2008, the Debtors transferred their
NYMEX trading account to Barclays Bank PLC, an action that
converted loss contingencies into recognized losses that exceeded
$2.4 billion.  These trading losses and increased margin
requirements eventually prevented the Debtors from meeting their
margin calls, and prompted their Chapter 11 filings.[4]

As of the Petition Date, the Banks asserted secured claims
against the Debtors and their affiliates (as either borrowers or
guarantors) in the aggregate amount of approximately $2.55
billion.  Pursuant to their Amended and Restated Security
Agreement, the Banks assert duly perfected security interests in
substantially all of the Debtors' property.[5]

---

[4]    The events giving rise to these bankruptcy proceedings
have been the subject of an extensive investigation by a
Court-appointed examiner. (See Final Report of Louis J. Freeh,
Bankruptcy Court Examiner, dated April 15, 2009 [Case No.
08-11525, Docket No. 3701]).  The Court's remarks in Section II
are intended as background only.

[5]    The Debtors have stipulated to the extent, validity and
priority of the Banks' security interests.  (See Final Order
Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001
and 9014 (I) Authorizing Debtors to Obtain Postpetition
Financing, (II) Authorizing Debtors to Use Cash Collateral, and

B. Factual Background Regarding the Oil and Gas Industry in
   Oklahoma

   The parties to this litigation have expended significant

time and effort in educating the Court as to the history and

particulars of oil and gas ownership and production in Oklahoma.[6]

While the Court is ruling herein on a discrete question of law –

whether § 570.10(A) of the PRSA creates a trust for the benefit

of the Oklahoma Producers – it is both helpful and necessary to

review this background in order to place this dispute in a proper

framework.

   Mineral rights may be severed from the fee simple absolute

ownership of property and thus owned separately from the surface

interest.  (Okla. Pls. Br., Ex. A ¶ 10).[7]  Before extraction, oil

and gas are treated as real property.  (12A Okla. Stat. Ann. § 1-

9-102 official cmt. ¶ 4(c)).  The term "as-extracted collateral"

_____

(III) Granting Adequate Protection to Prepetition Secured
Parties, at  3 [Case No.  08-11525, Docket No. 1420]).  Pursuant
to the Producer Claims Procedures Orders (defined and described
infra), final determination of the validity of the Banks' liens
is reserved for further proceedings.  At this stage, the parties
seek a declaratory judgment regarding the relative priority of
the Banks' security interests (assuming their validity for the
moment) as against the rights of the Oklahoma Producers under
applicable state law.

   [6]   The Court's knowledge of this industry is informed by
expert reports and affidavits submitted by the parties in support
of their respective summary judgment motions.

   [7]   Reference is to the brief in support of the Oklahoma
Plaintiffs' Motion for Summary Judgment on Phase I Issues.
[Docket No. 168].

thus refers to oil, gas or other minerals that are subject to a security interest before extraction from the ground. (See Del. Code tit. 6, § 9-301; 12A Okla. Stat. Ann. § 1-9-102 (a)(6)). Upon extraction, minerals become personal property. (12A Okla. Stat. Ann. § 1-9-102 official cmt. ¶ 4(c)).

Mineral owners rarely develop their minerals themselves. The technology and business of oil and gas exploration and development is complicated and expensive; few mineral owners possess the expertise or capital they need to act on their own. (Okla. Pls. Br., Ex. A ¶ 11).

Mineral owners typically transfer their mineral rights to an oil company through an oil and gas lease. A fee simple owner or severed mineral owner who grants a lease is called a lessor. A lessor typically receives a cash payment for granting the lease and retains a royalty, a percentage share of the oil and gas produced, or a percentage share of the value or revenues of production free of the costs of production. (Id. ¶ 13).

The person or oil company that receives a lease grant is called a lessee, and holds thereby the working interest, which includes the right to search, drill for, develop, produce, and market from the leased land. Often, a lessee will spread the cost of acquiring, evaluating, and exploring a lease by selling undivided percentages of the working interest to investors. The owners of the working interest have the right to all of the oil

-7-

and gas they produce from the land, other than that which goes to royalty owners, but must pay all costs of production. (Id.).

Both mineral owners and lessees often create from their interests additional types of interests in favor of other parties. These interests include "nonparticipating royalty" interests; "overriding royalty" interests and "carried" interests. (Id. ¶ 14).

Operators/working interest owners must obtain permission to drill from certain state agencies that are charged with optimizing production of oil and gas. They require drilling permits from the appropriate agency, and must comply with spacing rules designed to keep wells far enough apart to minimize the amount of drainage from one tract to another. Typically, it is necessary to put together several leases to have enough acreage to form a spacing unit. In addition, after wells have produced to the point that their production levels begin to decline, wells in several spacing units may be unitized, either voluntarily by their lessees, or by order of a state conversion agency, to maximize production from the formation. Unitization refers to the joint operation of all the leases and spacing units over a producing formation, usually in conjunction with enhanced-production techniques, which may substantially increase the percentage of oil and gas that is ultimately recovered. (Id. ¶ 16).

-8-

The lease owners in a spacing unit select one of their number to act as the unit operator.  An operator is responsible for day-to-day operation of the leases within a spacing unit.  To facilitate decision-making, the operator and the other working-interest owners in a spacing unit enter into an operating agreement.  An operating agreement sets out the parties' agreement with respect to the appointment of the operator, the operators' rights and duties, initial drilling, further develop-ment, the sharing of operations costs and revenues, the marketing and sale of oil and gas, and accounting.  (Id. ¶ 17).  As a practical matter, an operating agreement is designed to set forth a process by which the well is drilled and the production is established, and to govern the operations of a productive well after it has been established.  An operating agreement combines or pools the leases and fractional interests of the parties for operating purposes so that many leases are operated as if they were one.  (Id.).

Oil produced from a well by the operator is either temporarily placed in storage tanks and then transported by truck, or placed into a gathering line with other product to be delivered to a pipeline and transported.  Natural gas is always directed from the well through gathering lines into a pipeline. Transfer of title for either oil or gas may take place at a point of transfer on the spacing unit or at a market center or hub or

at any place in between.   (Id. ¶ 20).

Typically, royalty owners do not take their oil and gas in kind; royalty owners either sell to the operator or the operator markets their shares.  The operators usually act on behalf of the interest owners and sell for the account of the other owners of legal interests in the oil and gas.  For example, Oklahoma production was sold typically to Debtors by the operators of the Oklahoma wells, as the party authorized to market and sell the production from the Oklahoma wells.  (Okla. Pls. Br. ¶ 11).  Less frequently, purchasers contract directly with the owners of the oil and gas, but require that the unit operator accept payment on behalf of all the sellers in the unit and disburse the proceeds. In either case, the purchaser of oil and gas usually pays the proceeds of sales to the unit operator, who in turn distributes the proceeds to the interest owner.  (Okla. Pls. Br., Ex. A ¶¶ 22-23).

Those who disburse proceeds of oil and gas sales use division orders to protect themselves against claims that they have improperly paid to interest owners.  A division order is a statement executed by all parties who claim a legal interest in the oil and gas and in the funds generated by its sale, agreeing how the proceeds of oil and gas sales are to be distributed to them.  Interest owners who sign division orders and receive payments consistent with the division orders cannot later

complain that they were not paid properly.  (Id. ¶ 24).

In practice, as a result of severance of the mineral estate from the surface estate and partial sales of the minerals, it is not uncommon to find hundreds of royalty owners with interests in a single well.  Thus, the task – typically reserved to operators – of distributing proceeds to royalty owners is complex.  (Okla. Pls. Br., Ex. B ¶ 32).

The industry custom is that purchasers of oil and gas pay amounts due to the owners on the 20th day of the month following the delivery of oil and on the 25th day of the month following delivery of gas.  (Okla. Pls. Br., Ex. A ¶ 25).

## C. **Producer Claims**

In the course of their business, several of the Debtors (specifically, SemCrude, SemGas and Eaglwing) entered into agreements with a large number of oil and gas producers located in at least eight different states (collectively referred to hereinafter as the "Oil and Gas Producers") to purchase oil and gas.  The Oklahoma Producers are a subset of the Oil and Gas Producers.  The Oklahoma Producers are generally owners of working interests in oil and gas production from various wells located throughout Oklahoma, and many are operators of numerous wells pursuant to operating agreements with interest owners.  As operators, the Oklahoma Producers are authorized to market and sell oil and gas from the wells they operate, attributable to and

for the benefit of their own working interests and for the benefit of non-operating interest owners and royalty interest owners.  In addition, some of the Oklahoma Producers own non-operating interests in numerous wells that are operated by other parties who sold production to the Debtors.

During the relevant period (from June 1 through July 21, 2008), the Oklahoma Producers produced oil and gas from hundreds of wells situated in Oklahoma that was purchased by the Debtors. As noted previously, under general terms between the parties, the Debtors were obligated to pay for the Oklahoma Producers' production on July 20 and July 25, 2008, for June oil and gas sales, and on August 20 and 25, 2008, for July oil and gas sales.

Historically, the amounts owed on these contracts had been paid by the Debtors without incident in accordance with the above payment schedule.  The Debtors' liquidity crisis and bankruptcy filings in the summer of 2008, however, changed this pattern. When the Debtors filed their Chapter 11 petitions on July 22, 2008, the Oil and Gas Producers, including the Oklahoma Producers, had yet to receive payment for the oil and gas they had sold to the Debtors between June 1, 2008 and the Petition Date.  The parties are in agreement that the total production that the Debtors purchased (but did not pay for) from the Oklahoma Producers during the time period discussed above and for which payment has not been made is approximately $127 million.

-12-

(Okla. Pls. Br. ¶ 14).

The failure to pay the amounts owed on these contracts left over a thousand Oil and Gas Producers, including many in Oklahoma, looking for payment and seeking to determine in this Court what rights, if any, they had in the oil and gas they had sold to the Debtors (or the proceeds from the Debtors' sale of such product) between June 1 and the Petition Date under the laws of their respective states.  Within the month following the Petition Date alone, hundreds of reclamation demands were made upon the Debtors.  Many separate adversary proceedings relating to these reclamation demands or purported liens on the oil and gas in question were commenced.  A number of emergency motions, seeking either injunctive relief to prevent the sale or disposition of the oil and gas in question or a lifting of the automatic stay to proceed against it, also were filed in this Court within weeks of the Petition Date.

D. <u>Producer Claims Procedures Orders</u>

In an attempt to prevent a multiplicity of actions and preserve the resources of the Debtors and the Court, the Debtors filed a motion for authorization to establish omnibus procedures for, <u>inter alia</u>, the resolution of the rights and priorities of the Oil and Gas Producers' claims pursuant to sections 105(a) and 362 of the Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure [Case No. 08-11525, Docket No. 600].

-13-

Following the filing of this motion, representatives of certain
Oil and Gas Producers met with representatives of the Debtors to
discuss the procedures that could be utilized in such a
structure.  Through these extensive negotiations, the Debtors,
the Banks and the Oil and Gas Producers reached agreement on a
set of procedures that could be used to resolve these issues in
an efficient manner, and they presented this structure to the
Court for approval on September 17, 2008.  The Court has entered
two orders (the "Producer Claims Procedures Orders") adopting
this proposed structure [Case No.  08-11525, Docket Nos. 1425;
1557].

The structure approved by the Court calls for the Oil and
Gas Producers to initiate one adversary proceeding against the
Debtors for each state in which the Oil and Gas Producers sold
oil or gas to the Debtors, a total of eight states.  The purpose
of these adversary proceedings is for the Oil and Gas Producers
to obtain declaratory judgments establishing (i) what rights, if
any, are afforded by each respective state's law to a producer of
oil or natural gas who sells oil or natural gas to a first
purchaser, such as the Debtors here, and (ii) the priority of
these rights relative to the Banks' asserted security interests
in the Debtors' existing and after-acquired inventory.  All of
the Oil and Gas Producers were free to participate in this
litigation, and the Producer Claims Procedures Orders expressly

-14-

provided that the results of the litigation would be binding upon the Oil and Gas Producers irrespective of whether they actively participated in this process.

As may be apparent from the foregoing description, the claims of the Oklahoma Producers involve many individual transactions aggregating over $127 million in value. Accordingly, the actual calculation and allowance of individual Oklahoma Producers' claims is not presently before the Court. Likewise, the determination of the extent, validity and priority of the Banks' security interests is not presently before the Court (but is reserved for further proceedings), such that for purposes of this Opinion, the Court and the parties are presuming the validity and perfection of these asserted security interests.

In the present case, the Court will determine the rights, status, and relative priority of the interests of the Oklahoma Producers in the crude oil and natural gas they sold to the Debtors between June 1, 2008 and July 22, 2008 and the proceeds thereof.

This matter has been fully briefed.  The Court has conducted two full days of oral argument on these and related motions in May, 2009.  It is ripe for decision.

## II. <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O).

### III. <u>STANDARD OF REVIEW</u>

The parties have filed cross-motions for summary judgment regarding the existence and priority of their purported security interests in the property of the Debtors.  The Court notes that "the standards under which to grant or deny summary judgment do not change because cross-motions are filed."  <u>In re U.S. Wireless Corp., Inc.</u>, 386 B.R. 556, 560 (Bankr. D. Del. 2008).

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); <u>Showalter v. University of Pittsburgh Med. Ctr.</u>, 190 F.3d 231, 234 (3d Cir. 1999).  In doing so, the Court must view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party.  <u>In re Elrod Holdings Corp.</u>, 394 B.R. 760, 763 (Bankr. D. Del. 2008).

In order to avoid summary judgment, the nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial.  U.S. Wireless, 386 B.R. at 559.  An issue of material fact is genuine if the fact finder could return a judgment for the nonmoving party on the disputed issue.  Elrod Holdings, 394 B.R. at 763.  If the nonmoving party fails to present facts establishing a genuine issue for trial, the moving party is entitled to summary judgment.

Thus, the Court must ask: "(1) is there no genuine issue of material fact and (2) is one party entitled to judgment as a matter of law?"  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3rd Cir. 1992) (quoting Country Floors, Inc. v. Gepner, 930 F.2d 1056, 1060 (3d Cir. 1991)).

The underlying claim on which both sides seek summary judgment is one for declaratory relief.  It is well-settled that declaratory relief is available "to settle actual controversies before they ripen into violations of a law or breach of duty."  United States v. Fisher-Otis Co., 496 F.2d 1146, 1151 (10th Cir. 1974); see Step-Saver Data Sys., Inc. v. Wyse Tech., 912 F.2d 643, 647 (3d Cir. 1990).  Such relief is appropriate where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality."  Armstrong World Indus., Inc. by Wolfson v. Adams, 961 F.2d 405, 411 (3d Cir. 1992) (quoting Md. Cas. Co v. Pacific Coal & Oil Co., 312, U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)).

## IV.  DISCUSSION

### A. The Parties' Positions

This dispute concerns the legal effect and scope of §
570.10(A) of the PRSA.  That section, titled "Payment of Proceeds
From Sale of Oil and Gas Production," provides in its entirety as
follows:

> All proceeds from the sale of production
> shall be regarded as separate and
> distinct from all other funds of any
> person receiving or holding the same
> until such time as such proceeds are
> paid to the owners legally entitled
> thereto.  Any such person holding
> revenue or proceeds from the sale of
> production shall hold such revenue or
> proceeds for the benefit of the owners
> legally entitled thereto.  Nothing in
> this subsection shall create an express
> trust.

52 Okla. Stat. Ann. § 570.10(A) (emphasis added).

It is the position of the Oklahoma Producers that this
subsection, and in particular the underlined language, operates
to impose a trust over oil and gas production and the proceeds
therefrom for the benefit of the Oklahoma Producers.  If the
statute does indeed create or impose such a trust, then such
product or proceeds are not property of the Debtor's estates and
the Banks Article 9 security interests will not attach thereto.
As noted above, the amount claimed by the Oklahoma Producers to
be held in trust for their benefit is at least $127 million.

-18-

The Banks contend that the PRSA, read as a whole, is a regulatory and reporting statute, and does not impose any trust. First, they stress that the only use of the word "trust" in § 570.10(A) is in the negative:  "Nothing in this subsection shall create an express trust."  Second, the Banks argue that underlined language in the subsection above merely recognizes the substantial legal and fiduciary relationship between operators and interest owners, a fiduciary relationship long recognized under Oklahoma law.  Finally, the Banks observe that no court, state or federal, has ever construed the PRSA to impose a trust and that the statutory language is not sufficiently clear to permit or support such a reading.

At bottom, the parties seek declaratory relief regarding purely legal questions – the interpretation of two different statutory schemes.  Consequently, there is no genuine issue of disputed material fact that precludes the granting of summary judgment.

B. Construction of State Law

Each of the parties herein seek a declaration as to their respective property rights in certain oil and gas (and proceeds therefrom) produced and delivered in Oklahoma in the summer of 2008.  The determination of property rights is a matter of state law.  Butner v. United States, 440 U.S. 48, 54, 59 L.Ed.2d 136, 99 S.Ct. 914 (1979); In re Howard's Appliance Corp., 874 F.2d 88,

-19-

93 (2d. Cir. 1989).  Accordingly, the determination of whether §
570.10(A) creates a trust for the benefit of interest owners in
oil and gas production is governed by Oklahoma law.

In interpreting a state statute, a federal court must look
to interpretations of the subject matter by state courts.  When
there are no reported decisions by a state court interpreting a
state statute, a federal court must look to principles of
statutory construction under state law and make a reasonable
determination how the state's highest court would construe the
statute.  Estate of Meriano v. C.I.R., 142 F.3d 651, 659 (3d Cir.
1998); Baumbart v. Alam (In re Alam), 359 B.R. 142, 147 (6th Cir.
B.A.P. 2006);  In re North Side Lumber Co., 83 B.R. 735, 737 (9th
Cir. B.A.P. 1987), aff'd, 865 F.2d 264 (9th Cir. 1988).  Under
this standard, and in the complete absence of case law on §
570.10(A), the Court must look to the state law of Oklahoma for
the appropriate rules and standards to be applied to determine
the construction and interpretation that would be given by the
Oklahoma Supreme Court to § 570.10(A).

In Oklahoma, the primary rule of statutory construction is
to ascertain and declare the intention of the Legislature and to
carry such intention into effect.  City of Tulsa v. State ex rel.
Public Employees Relations Bd., 967 P.2d 1214, 1220 (Okla. 1998).
Legislative intent is generally ascertained from the whole
legislative act in light of its general purpose and object.

<u>Williams v. Nova Store Sys. LLC</u>, 109 P.3d 356, 358 (Okla. Civ.
App. Div. 2004).  If a statute is plain and unambiguous and its
meaning clear, it will be accorded the meaning expressed by the
language used.  <u>TRW/Reda Pump v. Brewington</u>, 829 P.2d 15, 20
(Okla. 1992).  Any doubt about the meaning of a statute may be
resolved by reference to its history.  <u>Lekan v. P & L Fire Prot.
Co.</u>, 609 P.2d 1289, 1292 (Okla. 1980).  Furthermore, a statute
will be given a reasonable construction that will avoid absurd
consequences if this can be done without violating legislative
intent.  The Legislature will not be presumed to have done a vain
or useless act in the promulgation of a statute.  <u>TRW/Reda Pump
v. Brewington</u>, 829 P.2d at 20.  In determining legislative
intent, the Oklahoma Supreme Court does not limit consideration
to one word or phrase but will consider the context of the
ambiguous provision.  <u>St. John Med. Ctr. v. Bilby</u>, 160 P.3d 978,
979 (Okla. 2007).

C. <u>Application of Oklahoma Trust Law to § 570.10(A)</u>

     Section 570.10(A) contains three sentences.  The first two
sentences state, "All proceeds from the sale of production shall
be regarded as separate and distinct from all other funds of any
person receiving or holding the same until such time as such
proceeds are paid to the owners legally entitled thereto.  Any
person holding revenue or proceeds from the sale of production
shall hold such revenue or proceeds for the benefit of the owners

legally entitled thereto."  § 570.10(A).

The Oklahoma Producers contend that two key phrases in the first two sentences of § 570.10(A), that "[a]ll proceeds of production shall be regarded as separate and distinct from all other funds" and "[a]ny person holding revenue or proceeds from the sale of production shall hold such revenue or proceeds for the benefit of the owners," contain language traditionally associated with the creation of a trust under Oklahoma law.  See Childers v. Breese, 213 P.2d 565, 567-68 (Okla. 1950); Riedell v. Stuart, 2 P.2d 929, 932 (Okla. 1931); Atchley v. Varner, 280 P. 616, 619 (Okla. 1929); Tolon v. Johnson, 230 P. 865, 868 (Okla. 1924).  The crux of the Oklahoma Producers' argument is that the above-quoted language in the first two sentences indicates that a trust "by operation of law" was intended, and that equitable title to the revenue or proceeds of production shall not be enjoyed with the legal title, thereby creating a resulting trust under Oklahoma law.

Under Oklahoma law, the burden of proving an implied trust is on the Oklahoma Producers because they are asserting it, and proof must be "clear, unequivocal, and decisive."  Gazalski v. Goss (In Matter of Estate of Ingram), 874 P.2d 1282, 1287 (Okla. 1994).  "Intention and consideration are essential elements of a resulting trust.  Intent can be actual or implied from the nature of the transaction and the facts surrounding it."  Cacy v. Cacy,

619 P.2d 200, 202-03 (Okla. 1980).  But "[t]he onus of establishing a resulting trust rests upon him who seeks its enforcement, and before a court of equity will be warranted in making a decree therefore the evidence must be clear, unequivocal and decisive."  Buxbaum v. Priddy, 312 P.2d 961, 964 (Okla. 1957) (quoting Gaines v. Gaines, 251 P.2d 1044, 1047 (Okla. 1952)).

The Oklahoma Producers cite cases showing that a number of statutes that originally did not have the word "trust" were nonetheless treated by courts as imposing one.  However, closer analysis reveals that these cases involve statutory constructs completely different and distinguishable from the PRSA.

For example, when Oklahoma enacted legislation creating its Special Indemnity Fund, Fireman's Relief Fund, and its State Insurance Fund, which are the subject of the Oklahoma Producers' cited cases, the legislature required separate dedicated accounts for the benefit of workers on account of injury or retirement pensions.  See Barber v. Special Indem. Fund, 875 P.2d 449 (Okla. Civ. App. 1994) (holding "Special Indemnity Fund," which was later changed to the "Multiple Injury Trust Fund," was established as a separate and distinct fund solely for the benefit of injured workers); Wallace v. Childers, 180 P.2d 1005, 1007 (Okla. 1947) (noting Firemen's Relief and Pension Fund "held in a separate and distinct right and capacity"); Fehring v. State Ins. Fund, 19 P.3d 276 (Okla. 2001) (noting State Insurance Fund

-23-

created as a separate and distinct fund) (hereinafter collectively referred to as the "Fund Cases").  In each of the Fund Cases, the entity in question operated as a separate state-created entity, with its own employees, board of directors, and state offices, and it served functions traditionally associated with trust relationships rather than commercial business relationships.

Each of the Fund Cases demonstrated the requisite clear intent to form a trust because the State of Oklahoma (or an organ thereof) is the trustee, holding identified funds, for the benefit of identified beneficiaries.  In sharp contrast, the PRSA does not identify a specific trustee, actually require segregation of a trust res[8] or otherwise impose rights and duties typically associated with a trustee/beneficiary relationship.

The remaining cases and state and federal statutes that the Oklahoma Producers cite are equally unavailing since these cases involve statutory trusts that use clear and operative "trust" language.  See Lone Star Milk Producers, Inc. v. Litzler, 370 B.R. 671, 676 (Bankr. N.D. Tex. 2007) ("Chapter 181 of the Texas Agriculture Code provides that, 'a milk processor shall hold in trust all payments received from the sale of milk for the benefit of the dairy farmer.'") (quoting Tex. Agric. Code Ann.

---

[8]    The PRSA does not actually require segregation of proceeds, and provides only that "proceeds shall be regarded as separate and distinct."  § 570.10(A) (emphasis added).

-24-

§ 181.002(a)) (emphasis added); Chao v. Lexington Healthcare Group, Inc., 335 B.R. 570, 575-76 (Bankr. D. Del. 2005) ("ERISA provides that 'all assets of an employee benefit plan shall be held in trust.'" (quoting 29 U.S.C. § 1103(a)) (emphasis added); In re Long John Silver's Rests., Inc., 230 B.R. 29, 32 (Bankr. D. Del. 1999) (PACA provides that certain buyers of perishable agricultural commodities hold the "commodities ... in trust for the benefit of all unpaid suppliers or sellers of such commodities.'" (quoting 7 U.S.C. § 499e(c)(2)) (emphasis added); Dairy Fresh Foods, Inc. v. Ramette (In re Country Club Mkt., Inc.), 175 B.R. 1005, 1008 (Bankr. D. Minn. 1994) (quoting Minn. Stat. § 27.138 as providing that a wholesale produce dealer "holds trust assets in trust for seller.") (emphasis added); see also 7 U.S.C. § 196 ("All livestock purchased by a packer in cash sales ... shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers") (emphasis added); 7 U.S.C. § 197 ("All poultry obtained by a live poultry dealer ... shall be held by such live poultry dealer in trust for the benefit of all unpaid cash sellers or poultry growers of such poultry, until full payment has been received by such unpaid cash sellers or poultry growers, unless ....) (emphasis added).

The Oklahoma Producers also cite cases for the proposition that § 570.10(A) uses language traditionally associated with the

creation of trust under Oklahoma law.  But none of these cases involved the interpretation of any Oklahoma statute, much less the PRSA.  See Childers, 213 P.2d at 565 (interpreting insurance policy); Riedell v. Stuart, 2 P.2d 929, 934 (examining corporate contracts); Atchley, 280 P. at 619 (examining implied trust relationship between operators and interest owners); Tolon, 230 P. at 868 (same).

The Oklahoma Producers further argue that § 570.10(A)'s clear disclaimer of an express trust in its final sentence "does not negate the existence of an implied trust but supports the conclusion."  (Okla. Pls. Br. ¶ 64).  Basically, the Oklahoma Producers contend that because only "express trusts" are excluded, other trusts must be included; and counsel correctly noted at argument that the legislature could have disposed of this whole dispute if the last sentence read "Nothing in this subsection shall create a trust."  However, the Oklahoma Producers provide no authority for a principle of statutory construction that the express exclusion of one thing implies the inclusion of another.  Courts have repeatedly rejected this principle when construing statutes or contracts.  See Walling v. Jacksonville Paper Co., 317 U.S. 564, 571 (1943) ("Since retailers are excluded by reason of these express provisions, it is thought that the inclusion of wholesalers should be implied. There is, however, no indication in the legislative history that

but for the exemption of retailers it was thought that all
movement of goods from manufacturers to wholesalers and on to
retailers would be 'in commerce' within the meaning of the
Act."); Rosslyn Concrete Const. Co. v. N.L.R.B., 713 F.2d 61, 64
(4th Cir. 1983) ("The Company next contends that the
stipulation's express exclusion of 'office clerical workers,
professional employees, guards and supervisors' implies the
inclusion of the timekeepers by virtue of the maxim expressio
unius est exclusio alterius.... The Company's arguments,
plausible on their face, collapse under scrutiny. We cannot
accept the Company's claim that the stipulation's plain language
mandates inclusion of the timekeepers in the bargaining unit.")
(emphases in original); Doak v. City of Claxton, 390 F.Supp. 753,
756 (S.D. Ga. 1975) (rejecting principle that "[t]he expression
of one thing is the inclusion of another.").

The requisite intent for creating a resulting trust under
Oklahoma law must be clear, decisive, and unequivocal. Estate of
Ingram, 874 P.2d at 1287. Here, the Court concludes that §
570.10(A) of the PRSA does not create a resulting trust because
the intent to create one is simply not provided by the plain
words of the statute.

D. The PRSA Is Primarily A Reporting And Remittance Statute

The Court's conclusion above is buttressed by a review of
the entirety of the PRSA, a statute encompassing dozens of

subsections and more than 10 pages of single-spaced statutory
text.  It is well established that sections of statutes need to
be read in context with other relevant sections in order "to give
full force and effect to each."  See World Pub. Co. v. Miller, 32
P.3d 829, 832 (Okla. 2001); Price v. State ex rel. Okla. Tax
Comm'n (In re Holt), 932 P.2d 1130, 1135 (Okla. 1997) ("[T]he
entire statute must be read as a whole, and the meaning given to
one section should be determined by considering the other
sections.").  Thus, a review of the PRSA as a whole is central to
a proper analysis of § 570.10(A).

Read in its entirety, the PRSA provides a comprehensive
regulatory structure governing how interest owners and operators
work together at the wellhead, and serves to hold operators
accountable to their interest owners.  Various subsections of the
statute provide: (a) operators, producers, and royalty owners
share proceeds among each other in accordance with specific
accounting and reporting requirements (§§ 570.4 & 570.6); (b)
working interest owners can designate a person other than an
operator to perform these various accounting and remittance
functions (§ 570.5); (c) for certain "out of balance" gas wells,
producers can agree with royalty owners and operators to
distribute royalties in a manner other than proportionate shares
(§ 570.7); (d) operators, producers, and royalty owners must
provide written statements to each other within designated time

periods regarding items such as royalty interest, tax
information, identity of purchasers, and volumes of gas metered
at a particular well (§ 570.8); (e) a producer has the right to
produce separately its proportionate production and own those
proceeds (§ 570.9); (f) operators have to pay proceeds of
production to interest owners within certain time periods, with
specific interest rate penalties for late payments (§ 570.10);
and (g) certain information, such as lease or well
identification, barrels, and price, must be included with each
payment made to interest owners (§ 570.12).

These reporting and remittance requirements of the PRSA are
not attributes normally found in a trust, but are more consistent
with commercial and contractual relationships.  For example, §
570.10(D) entitles interest owners to 12% interest payments as a
penalty against operators and others for late payment.  When
those proceeds are not paid because of unmarketable title,
interest owners claiming ownership can require the holder to
interplead those payments and accrued interest into court.
Section 570.14 provides interest owners with contractual
remedies, such as litigation costs and attorneys' fees.  Section
570.9(E) allows purchasers to set the price, terms, or conditions
under which they can take production, indicative of a freedom to
contract as they wish.  Section 570.10(C) creates a safe-harbor
provision discharging operators and others from liability upon

timely payment of proceeds to interest owners.

These are commercial terms not consistent with a trust relationship.  The court in <u>Frontier Pepper's Ferry, LLC v. Landamerica 1031 Exch. Servs., Inc. (In re Landamerica Financial Group, Inc.)</u>, No. 08-35994-KRH, 2009 WL 1269578 (Bankr. E.D. Va. May 7, 2009), recently recognized that relationships requiring the payment of fixed interest for the use of funds normally indicate a debtor-creditor relationship, not a trust.  There, the court wrote:

> [i]f there is an understanding between the parties that the person to whom funds are transferred is to pay "interest" thereon (at a fixed or current rate, and not merely such interest or other earnings as the funds, being invested, may earn), <u>it becomes close to certain that the relationship is a debt rather than a trust</u>. Interest is normally paid for the "use of funds."  Accordingly, recipients of funds who pay interest are, in the absence of a definite understanding to the contrary, borrowers who are entitled to use the funds for their own purposes.

<u>Id.</u> at *11 (quoting Restatement (Third) of Trusts § 5(k), cmt. k.) (emphasis added).  Because the PRSA requires operators to pay interest to owners at specified rates and otherwise has common commercial terms and conditions throughout, the Court finds that the statute concerns a debtor-creditor relationship and does not impose a trust relationship.

The reported decisions that have applied or construed other sections of the PRSA have found that, consistent with debtor-

-30-

creditor commercial relationships, the PRSA is a reporting and remittance statute.  None of these cases has suggested, much less found, a resulting trust.  These cases all have involved interest owners who sued operators or producers for delinquent royalty payments.  See Howell v. Texaco Inc., 112 P.3d 1154, 1158 (Okla. 2004) (mineral interest owners sued operator for breach of fiduciary duty and constructive fraud for failure to properly account for royalties); Goodall v. Trigg Drilling Co., 944 P.2d 292, 293 (Okla. 1997) (appeal of summary judgment awarding interest owner accounting and proceeds of production from operator); Heiman v. Atlantic Richfield Co., 891 P.2d 1252, 1255 (Okla. 1995) (interest owner seeking 12% penalty interest for operator's failure to pay royalties); Fleet v. Sanguine, Ltd., 854 P.2d 892, 896 (Okla. 1993) (mineral interest owners seeking 12% penalty interest for operator's failure to pay royalties); McClain v. Ricks Expl. Co., 894 P.2d 422, 431 (Okla. Civ. App. 1994) (operator liable under PRSA for 1/8th royalty interest to interest owner).

E. Oklahoma Attorney General Opinion

Although no court has addressed the interpretation of § 570.10(A), the Attorney General for the State of Oklahoma has recently issued a written opinion directly on this issue.

In Oklahoma, a court will look to an opinion of the Attorney General for guidance in construing a statute.  While the Oklahoma

-31-

Supreme Court is not bound by an Attorney General opinion, the Court does accord "great weight" to an Attorney General's opinion concerning the construction of statutes.  See Goodin v. Board of Educ. of Indep. School Dist. No. 14 of McCurtain County, 601 P.2d 88, 90-91 (Okla. 1979); see also State ex rel. Clifton v. Reeser, 543 P.2d 1379, 1384 (Okla. 1975) (holding Attorney General opinion accorded "great respect").

Federal courts regularly give deference to Attorney General opinions when construing a state statute.  In re Bernstein, 230 B.R. 144, 150 (Bankr. D.N.D. 1999).  Attorney General opinions are important authority on questions involving state law and are generally followed if consistent with a statutory interpretation deemed reasonable to the court.  Prescott v. United States, 731 F.2d 1388, 1393 (9th Cir. 1984).

In an opinion dated November 5, 2008, the Attorney General discusses the history of the drafting of the PRSA and the context in which it was enacted.  The Attorney General concludes with the following official opinion:

> It is, therefore, the official Opinion of the Attorney General that:
>
> The Legislature intended an implied trust (whether resulting or constructive) under the provisions of Section 570.10(A) of Title 52. See Cacy v. Cacy, 619 P.2d. 200, 202 (Okla. 1980); Littlefield v. Roberts, 448 P.2d 851, 856 (Okla. 1968); Bryant v. Mahan, 264 P. 811, 812 (Okla. 1927).  Furthermore, the holder of the revenue or proceeds of oil and

gas production is an implied trustee who has
no rights in or to such revenue or proceeds
and who is under a statutory duty to pay the
revenue or proceeds of oil and gas production
to the implied beneficiaries; i.e., the
owners legally entitled thereto.  The holder
of the revenue or proceeds of oil and gas
production acquires no right, title or
interest in such revenue or proceeds.

Consistent with the principles outlined above, this Court
accords great weight and respect to the Attorney General Opinion.
This respect and deference cannot, however, override the clear
principles of statutory construction described earlier herein
that guide Oklahoma courts in interpreting and construing
statutes.  The sole question of law presently before this Court
is whether the three sentences of § 570.10(A) create a trust.
The Attorney General Opinion concludes that a trust is indeed
created thereby.  For the reasons described at length above, this
Court respectfully disagrees with the Attorney General Opinion
and holds that the plain meaning of this subsection of the PRSA
is clear, and no trust is created or imposed thereby.

F. Oklahoma Law Recognizes A Special Relationship Between
   Operators And Interest Owners

Finally, the Oklahoma Producers have argued that failure to
impose a trust here would yield an absurd result, or at least
would render the first two sentences of § 570.10(A) a nullity.
At bottom, they contend that the phrases "separate and distinct"
and "for the benefit of" must yield a trust or they mean nothing.

The Court disagrees.  The language of the PRSA, as construed herein, remains entirely consistent with the substantial and long-recognized relationship between operators and interest owners.  See Conoco, Inc. v. J.M. Huber Corp., 148 F.Supp. 2d 1157, 1171 (D. Kan. 2001) ("Oklahoma law does recognize that some fiduciary relationship exists between unit operators and interest owner"); Goodall, 944 P.2d at 295 (the "operator has a duty to pay proceeds from the sale of oil or gas to the legal owner.").

It is abundantly clear to the Court that the PRSA exists in large measure to provide substantial protections to interest owners.  The numerous subsections identified above create enforceable rights and remedies for the benefit of interest owners, and impose substantial duties on operators.  Viewed in this context, the use of "traditional trust language" in describing the requirement that operators must pay over proceeds to interest owners is neither remarkable nor dispositive of an intention to create or impose a formal trust.[9]

G. The Oklahoma Producers Do Not Have Priority Under The Lien Act

As a separate argument, the Oklahoma Producers have contended that the Oklahoma Oil and Gas Owners Lien Act, Okla. Stat. Ann. tit. 52, § 548 et seq. (the "Oklahoma Lien Act") gives them a statutory lien in revenue or proceeds from Oklahoma

---

[9]    On account of its ruling, the Court does not reach the constitutional and other challenges that the Banks and J. Aron have asserted against the PRSA.

-34-

production.  The Oklahoma Lien Act provides, in relevant part, as
follows:

> To secure payment from the sale of oil or
> gas, an interest owner, subject to Section 5
> of this act, shall have a continuing security
> interest in and a lien upon the oil or gas
> severed, or the proceeds of the sale if such
> oil or gas has been sold, to the extent of
> his interest until the purchase price has
> been paid to the interest owner.

52 Okla. Stat. Ann. § 548.2(A).

Section 548.6(C) of the Lien Act expressly states that this
section does not "impair or affect the rights, priorities, or
remedies of any person under provisions of the Uniform Commercial
Code."  52 Okla. Stat. Ann. § 548.6(C).  Thus, the statute
appears on its face to create a lien in favor of interest owners
that is not superior to holders of Article 9 security interests.

In Arkla Exploration Co. v. Norwest Bank of Minneapolis, 948
F.2d 656, 660 (10th Cir. 1991), the Tenth Circuit affirmed
decisions of Oklahoma federal courts holding that a lender with a
prior perfected security interest under the Oklahoma UCC had
superior rights relative to an Oklahoma gas producer under the
Oklahoma Lien Act as a matter of law.  As the Tenth Circuit
explained, "under the unambiguous language of section 548.6(C), a
lien authorized under the Lien Act shall not 'impair or affect
the rights and remedies of any person under the provisions of'
the Oklahoma U.C.C."  Id. at 659.  As a result, "while the Lien

-35-

Act, by its clear language, authorizes a lien to secure payment
... to an interest owner, it also insures that security interests
under the Oklahoma UCC are not subordinated to that lien." Id.

The court in Arkla noted that priority of security interests
recognized under the Oklahoma UCC is further buttressed by

> § 548.6(C)'s location in the Lien Act after
> section 548.4(C).  Indeed, section 548.6(C)
> is the final section of the Lien Act.  The
> established rule in Oklahoma is that if
> there is any conflict between two sections
> of a statute, the last in order of position
> must prevail.  Thus, the priority rule set
> forth in section 548.4(C) must be read as
> restricted by the protections provided by
> section 548.6(C) for persons with interests
> under the Oklahoma UCC.

948 F.2d at 659 (citation omitted).

Under the plain language of the Oklahoma Lien Act and the
holding in Arkla, the Banks' asserted security interests and
liens under Article 9 of the UCC would enjoy priority over any
lien in favor of the Oklahoma Producers arising under the Lien
Act.  In the words of the Tenth Circuit:  "Any other reading of
the Lien Act is simply contrary to the plain language used by the
Oklahoma Legislature." Arkla, 948 F.2d at 659.

Based upon the foregoing, if the Oklahoma Producers can
demonstrate that they have complied with the requirements of the
Oklahoma Lien Act, they would have liens on the Oklahoma oil or

gas and its proceeds,[10] which liens would be junior to those of
the Banks but senior to unsecured creditors.

## V.  <u>CERTIFICATION FOR DIRECT APPEAL</u>

As noted at the outset of this Opinion, the Court rules
today on a true question of first impression.  At issue is,
ultimately, a sum of not less than $127 million.  The Court has
little doubt that this decision will be appealed.

Recent amendments to title 28 of the United States Code
afford this Court the option to certify a matter for direct
appeal to the Circuit Court of Appeals, assuming certain criteria
are met; the decision of whether to take the appeal rests, of
course, with the Court of Appeals.  Direct appeals are governed
by 28 U.S.C. § 158(d)(2), which provides, in relevant part, as
follows:

> (2)(A)    The appropriate court of appeals
> shall have jurisdiction of appeals
> described in the first sentence of
> subsection (a) if the bankruptcy
> court, the district court, or the
> bankruptcy appellate panel
> involved, acting on its own motion
> or on the request of a party to the
> judgment, order, or decree

---

[10]    The existence of these lien rights bears upon, and
supports, the Court's earlier construction of the PRSA.  The Lien
Act predates enactment of the PRSA, and was not repealed upon
enactment of the PRSA.  The Oklahoma Producers' contention that
the PRSA imposes a trust for their benefit upon production and
proceeds is belied by the continued vitality of the rights
afforded under the Lien Act, as it is axiomatic that a party
cannot hold a lien in its own property.

described in such first sentence,
or all of the appellants and
appellees (if any) acting jointly,
certify that –

(i)   the judgment, order or decree
      involves a question of law as
      to which there is no
      controlling decisions of the
      court of appeals for the
      circuit or of the Supreme
      Court of the United States, or
      involves a matter of public
      importance;

(ii)  the judgment, order, or decree
      involves a question of law
      requiring resolution of
      conflicting decisions; or

(iii) an immediate appeal from the
      judgment, order, or decree may
      materially advance the
      progress of the case or
      proceeding in which the appeal
      is taken; and if the court of
      appeals authorizes the direct
      appeal of the judgment, order,
      or decree.

28 U.S.C. § 158(d)(2)(A).

In the present case, the Court finds that the statutory
criteria are met: there is no governing law on the issue before
the Court, and it appears that prompt consideration of the appeal
may serve to advance these bankruptcy proceedings.  This last
point is especially true given that the Debtors have recently
filed a plan of reorganization and have expressed an intention to
seek confirmation of such plan and emerge from bankruptcy in

-38-

September, 2009.  Accordingly, the Court deems it appropriate to
certify this matter <u>sua sponte</u> for direct appeal to the United
States Court of Appeals for the Third Circuit.

## VI.   <u>CONCLUSION</u>

For all of the foregoing reasons, the Court concludes that §
570.10(A) of the PRSA does not operate to impose a trust for the
benefit of the Oklahoma Producers under either the PRSA or the
Lien Act.  Summary judgment will be entered in favor of the Banks
in that the Court finds, rules and declares that duly and
properly perfected Article 9 security interests in Oklahoma oil
and gas production and the proceeds thereof are senior and
superior to any interest held by the Oklahoma Producers.
Further, the Court <u>sua sponte</u> certifies this matter for direct
appeal to the United States Court of Appeals for the Third
Circuit pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii).

An appropriate Order will issue.

BY THE COURT:

Dated:      Wilmington, Delaware    _____
            June 19, 2009           Brendan Linehan Shannon
                                     United States Bankruptcy Judge

-39-